IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

NANETTE M. NELSON,            §
    PLAINTIFF,                §
                              §
VS.                          §   CIVIL ACTION NO. 4:11-CV-855-Y
                              §
MICHAEL J. ASTRUE,           §
COMMISSIONER OF SOCIAL SECURITY, §
    DEFENDANT.                §

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE
### AND
### NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions, and Recommendation of the United States Magistrate Judge are as follows:

### FINDINGS AND CONCLUSIONS

### I. STATEMENT OF THE CASE

Plaintiff Nanette M. Nelson ("Nelson") filed this action *pro se* pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits ("DIB") under Title II and supplemental security income ("SSI") under Title XVI of the Social Security Act ("SSA"). Nelson applied for DIB and SSI on March 17, 2006, alleging that her disability began on February 1, 2004.[1]  (Tr. 226, 230.)

After her application for benefits was denied initially and on reconsideration, Nelson requested a hearing before an administrative law judge ("ALJ"). (Tr. 107–10, 150.) The ALJ held a hearing on April 10, 2008, and issued an unfavorable decision on June 20, 2008. (Tr.

---

[1] The Court notes that Nelson's SSI application alleges that her disability began on April 2, 1993. (Tr. 230.)

111–25.)  Upon Nelson's request for review, the Appeals Council vacated the hearing decision

on October 9, 2009, and remanded the case for a new hearing and decision.  (Tr. 126–30.)  A

new ALJ held a hearing on July 8, 2010, and issued another unfavorable decision on September

16, 2010.  (Tr. 17–39.)  On October 13, 2011, the Appeals Council denied Nelson's request for

review, leaving the ALJ's September 16, 2010 decision as the final decision of the

Commissioner in her case.  (Tr. 2–5.)  Nelson subsequently filed this civil action seeking review

of the Commissioner's decision.

## II.  STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are

governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA.  In addition, numerous regulatory

provisions govern disability insurance and SSI benefits.  *See* 20 C.F.R. Pt. 404 (2012)

(disability); 20 C.F.R. Pt. 416 (2012) (SSI).  Although technically governed by different statutes

and regulations, "[t]he law and regulations governing the determination of disability are the same

for both disability insurance benefits and the SSI."  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th

Cir. 1994).  The SSA defines a "disability" as a "medically determinable physical or mental

impairment" lasting at least twelve months that prevents the claimant from engaging in "any

substantial gainful activity."  42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see McQueen v. Apfel*, 168

F.3d 152, 154 (5th Cir. 1999).

To determine whether a claimant is disabled, and thus entitled to benefits, a five-step

analysis is employed.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  First, the claimant must not

be presently working at any substantial gainful activity.  *Id.* §§ 404.1520(b), 416.920(b).

"Substantial gainful activity" is defined as work activity "that involves doing significant physical

or mental activities . . . for pay or profit."  *Id.* §§ 404.1572, 416.972.  Second, the claimant must

have an impairment or combination of impairments that is severe.  *Id.* §§ 404.1520(c),

461.920(c); *see also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000).   Third, disability will be found if the impairment or combination of impairments meets or equals an impairment contained in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1.   20 C.F.R. §§ 404.1520(d), 416.920(d).   Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to her past relevant work. *Id.* §§ 404.1520(f), 416.920(f).   And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(g), 416.920(g); *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir. 1999).

Before moving from the third to the fourth step of the inquiry, the Commissioner assesses the claimant's residual functional capacity ("RFC") to determine the most the claimant can still do notwithstanding her physical and mental limitations.   20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).   The claimant's RFC is used at both the fourth and fifth steps of the sequential analysis. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).   At step four, the claimant's RFC is used to determine if the claimant can still do her past relevant work. *Id.* §§ 404.1520(e), 416.920(e).   At step five, the claimant's RFC is used to determine whether the claimant can adjust to other types of work. *Id.* §§ 404.1520(e), 416.920(e).   At steps one through four, the burden of proof rests upon the claimant to show that she is disabled. *Crowley*, 197 F.3d at 198.   If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of her existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence

in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

### III.  ISSUES

Nelson presents the following issues:

1.   The ALJ erred by failing to find Nelson's anxiety/depression to be a severe impairment;

2.   The ALJ erred by failing to follow the "treating physician's rule";

3.   The ALJ erred by improperly relying on the opinions of a nonexamining physician;

4.   The ALJ erred by failing to provide a function-by-function assessment of Nelson's RFC; and

5.   The ALJ erred by failing to find Nelson to be credible.

(Pl.'s Br. 3.)

### IV.  ALJ DECISION

In his September 16, 2010 decision, the ALJ concluded that Nelson was not disabled within the meaning of the SSA. (Tr. 33.) In making this determination, the ALJ proceeded to follow the five-step sequential evaluation process. At the first step, the ALJ found that Nelson had not engaged in any substantial gainful activity since February 1, 2004—the alleged onset of disability date in Nelson's DIB application. (Tr. 20.) At the second step, the ALJ found that

Nelson had the following severe impairments: 1) seizure disorder, 2) arthritis, 3) migraine headaches, and 4) depression.[2]  (Tr. 20.)   At the third step, the ALJ found that Nelson's severe impairments did not meet or equal in severity to an impairment contained in the Listing.  (Tr. 20.)

> The ALJ then assessed Nelson's RFC as follows:
>
> Ms. Nelson has retained the following residual functional capacity: lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk (individually or in combination) throughout an 8-hour workday, but she requires a modified sit/stand option (usually able to change position briefly every 20 minutes); and otherwise perform the full range of light work, with the following exceptions.  She is able to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl frequently.  She must follow seizure precautions, including: (1) no exposure to hazards, such as unprotected dangerous machinery; (2) no working at unprotected heights, including no climbing ladders, scaffolds, or ropes; and (3) no driving.  She is limited to jobs with a reasoning development level of 1 or 2 (as defined in the *Dictionary of Occupational Titles*).

(Tr. 27.)  Next, at the fourth step, the ALJ found that Nelson was unable to perform any of her past relevant work.  (Tr. 31.)  Finally, at the fifth step, the ALJ opined that, based on Nelson's RFC and on her age, education, and work experience, there were jobs that existed in significant numbers in the national economy that Nelson could perform.  (Tr. 31.)  Thus, Nelson was not disabled and had not been disabled at any time through the date of the decision.  (Tr. 33.)

## V.   DISCUSSION

### A.   Nelson's Mental Impairment

#### 1.   Medical History

In her first and third issues, Nelson argues that the ALJ erred by failing to find her "anxiety/depression" to be a severe impairment and by improperly relying on the opinions of a

---

[2] The ALJ also found that Nelson had been "assessed with fibromyalgia and degenerative joint disease," but he did not find these impairments to be severe.  (Tr. 20.)

nonexamining physician with regard to her mental impairment.[3]   The earliest mention of a mental impairment in the medical records is a diagnosis of "acute stress reaction" after Nelson's wrist was injured at work on February 17, 2004. (Tr. 367.) Nelson was prescribed Xanax to take as needed. (Tr. 367.) Complaining again of anxiety, Nelson was seen by a psychologist on March 30, 2004, and the psychologist referred her to a mental health therapist. (Tr. 380.) On April 27, 2004, Nelson reported to the psychologist that she was satisfied with her therapist and would continue seeing him. (Tr. 382.) Records of a May 4, 2004 exam by her primary care physician reflect that her physician diagnosed her with anxiety. (Tr. 366.) On May 11, 2005, Nelson's primary care physician prescribed Xanax for her anxiety to take as needed. (Tr. 22, 363–64.) On May 12, 2006, an internal medicine consultative examiner assessed Nelson with uncontrolled generalized anxiety (in addition to arthritis and a seizure disorder). (Tr. 23, 409.)

On April 11, 2007, Nelson sought mental health treatment from MHMR, complaining of anxiety, depression, stress, pressure in her chest, and lack of sleep. (Tr. 489.) Nelson's request for services was denied because she did not meet initial screening eligibility criteria, but she was given suggestions of other sources for services including counseling, free medical treatment, and prescription assistance.[4] (Tr. 478–80.) Nelson again sought treatment from MHMR two years later, and this time she was authorized for care on November 30, 2009. (Tr. 658.) Nelson's MHMR assessment form reports that Nelson's main reason for being out of the labor force was that she was "not able to find/keep job." (Tr. 658.) However, Nelson also said during her intake assessment that she had been unemployed since 2001 "due to health." (Tr. 661.) She was

---

[3] Although Nelson's *pro se* brief includes no citations to the record and almost no supporting argument, the Court notes that Nelson's issues are the same as those presented to the Appeals Council by her previous attorney. (Tr. 320–26.) In the interests of justice and judicial economy, the Court will address those supporting arguments found in the brief to the Appeals Council.

[4] Nelson does not explain, and the Court cannot determine from the record, the reasons underlying MHMR's conclusion that she did not satisfy the eligibility requirements for mental health services through MHMR.

diagnosed with major depressive disorder, recurrent, severe without psychotic features, and she was assessed a GAF score of 48.[5] (Tr. 658.)

A January 18, 2010 progress report with Nelson's MHMR case manager shows that Nelson reported "doing a lot better" since her last visit. (Tr. 653.) Nelson reported that she had been going to counseling and that it had "really help[ed] her." (Tr. 653.) Nelson also stated that she was concerned about her medications because they made her "feel like a zombie." (Tr. 653.) That same day, a MHMR psychiatrist assigned her a GAF score of 50. (Tr. 665.) Nelson saw the MHMR psychiatrist again on March 15, 2010, and June 14, 2010. (Tr. 681, 684.) The only symptoms noted by the psychiatrist were depression and anxiety, which the psychiatrist rated as one on a severity scale of zero to ten (with zero indicating no symptoms, and ten indicating extreme) as to both. (Tr. 682, 685.)

After the ALJ's September 16, 2010 decision, Nelson submitted new records from MHMR to the Appeals Council dated January 19, 2011, and April 4, 2011. The January 19, 2011 records consist of assessments of depression and daily living activities performed by Nelson's MHMR case manager. While the depression assessments show that Nelson's symptoms had intensified since June 2010, the most current score indicated that Nelson's depression was mild.[6] (Tr. 763.) Nelson's daily living activities assessment showed that her

---

[5] The Global Assessment of Functioning (GAF) scale rates psychological, social, and occupational functioning on a scale of 0 to 100. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text rev. 2000) [hereinafter "*DSM-IV-TR*"]. A GAF code of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* The assessment form does not indicate who made this initial diagnosis and GAF assessment.

[6] On the Quick Inventory of Depressive Symptomatology assessment, Nelson's score on June 14, 2010 was 6; on July 14, 2010, her score was 9; on October 11, 2010, her score was 11; and on January 19, 2011, her score was 10. (Tr. 763.) Scores from 6–10 indicate mild depression, and scores from 11–15 indicate moderate depression. *See* University of Pittsburgh Epidemiology Data Center, Inventory of Depressive Symptomatology (IDS) & Quick Inventory of Depressive Symptomatology (QIDS) 18 (2012), *available at* http://www.ids-qids.org/idsqids.pdf. Therefore, even though medical records show that Nelson's depressive symptoms worsened from June 2010 to January 2011, her depression still scored as "mild" at three of the four assessments performed during that time period.

case manager believed that she was at least moderately impaired in most areas of daily living except for alcohol/drug use, sexuality, and personal hygiene. (Tr. 764.) An April 4, 2011 progress note consists of the case manager's observation that Nelson appeared to be making no progress towards successful progression out of MHMR based on her lack of medication compliance (Prozac) and her own self-reports. (Tr. 762.)

### 2.   Medical Opinions of Mental Health Specialists

On May 9, 2006, Nelson underwent a mental status examination by consultative examiner Bobbie Hart Lilly, Ph.D. ("Dr. Lilly"). (Tr. 22, 397.) The reason for the referral was to evaluate Nelson's allegations of memory problems and anxiety. (Tr. 22, 397.) Dr. Lilly reported that Nelson "scored in the moderate range on an empirically validated measure of hopelessness, in the severe range on a measure of symptoms of depression and in the moderate range on a measure of symptoms of anxiety." (Tr. 22, 400.) Nelson exhibited 1) moderate impairment in activities of daily living; 2) minimal impairment in memory, attention, and concentration; 3) severe impairment in abstract thinking; and 4) mild impairment in insight and judgment. (Tr. 400–01.)

Dr. Lilly diagnosed Nelson with mood disorder due to multiple health problems with depressive features and assessed a GAF score of 35.[7] (Tr. 22, 402.) Dr. Lilly summarized that Nelson "was functioning in the impaired range on the majority of the domains assessed." (Tr. 402.) Dr. Lilly then provided the following recommendation:

> [Nelson] appears cognitively intact and functioning at an average intellectual level but reports severe impairment in social and occupational functioning due to her overall health. In consideration of these chronic and progressive health concerns it is not considered reasonable to expect her to return

---

[7] A GAF score of 31–40 indicates "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* Dr. Lilly's opinion specifies that she assessed a GAF score of 35 because Nelson had a "[m]ajor impairment in social and occupational functioning." (Tr. 402.)

to work in a competitive environment where she will be required to maintain attention, concentration, persistence or pace or complete a normal workday at this time. . . . She would likely benefit from a trial course of antidepressant medication in conjunct[ion] with either group or individual psychotherapy to help her learn better coping skills in dealing with her life situation and her declining health.

(Tr. 22, 402.)

On June 1, 2006, a nonexamining State agency consultant, Leela Reddy, M.D. ("Dr. Reddy"), filled out a Psychiatric Review Technique form indicating her medical opinion that Nelson's mental impairment did not meet or equal an impairment contained in the Listing.[8] Dr. Reddy opined that Nelson had the medically determinable impairment of mood disorder due to a medical condition. (Tr. 416.) Dr. Reddy indicated on the form that the category of the Listing upon which she based her opinion was section 12.04 of the Listing, Affective Disorders.[9] (Tr. 413.) Dr. Reddy did not check the box indicating that she based her opinion on section 12.06 of the Listing (Anxiety-Related Disorders), and she did not state that Nelson had any medically determinable impairment that was anxiety-related. (Tr. 418.)

---

[8] The "technique" is a set of mandatory steps that the regulations require an ALJ to follow when evaluating the severity of mental impairments in claimants. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). The ALJ first considers whether a claimant has a medically determinable mental impairment. See 20 C.F.R. Pt 404, Subpt. P, App. 1 § 12.00; 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). The ALJ next must evaluate the degree of functional loss resulting from the claimant's mental impairments in four functional areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The degree of limitation in the first three functional areas is rated on a five-point scale, which includes none, mild, moderate, marked, and extreme. 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). The degree of the fourth functional area is rated on a four-point scale, which includes none, one or two, three, and four or more. 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).

After the ALJ rates the degree of functional limitation resulting from any mental impairment, the ALJ determines the severity of such impairment. 20 C.F.R. §§ 404.1520a(d), 416.920a(d). The regulations contain a presumption that if the claimant's degree of limitation is rated as none or mild in the first three functional areas and as none in the fourth area, the ALJ will generally conclude that the claimant's mental impairment is not severe. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). However, this presumption may be rebutted if "the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

[9] Section 12 of the Listing, Mental Disorders, is arranged in nine diagnostic categories: 1) organic mental disorders, 2) schizophrenic, paranoid, and other psychotic disorders, 3) affective disorders, 4) mental retardation, 5) anxiety-related disorders, 6) somatoform disorders, 7) personality disorders, 8) substance addiction disorders, and 9) autistic disorder and other pervasive developmental disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.

On the form, Dr. Reddy assessed Nelson's functional limitations and opined that Nelson had 1) moderate limitations in activities of daily living; 2) mild difficulties in maintaining social functioning; 3) moderate difficulties in maintaining concentration, persistence, or pace; and 4) no episodes of decompensation. (Tr. 29, 423.) Dr. Reddy noted the GAF score of 35 given by consultative examiner Dr. Lilly but stated that "there is no clear indication of symptoms that would warrant such a low GAF." (Tr. 425.) Dr. Reddy concluded that Nelson's level of psychological symptoms did not preclude her ability to sustain substantial gainful activity and that her alleged limitations were not credible. (Tr. 29, 425.) Accordingly, Dr. Reddy's opinion regarding Nelson's mental residual capacity was that Nelson could "understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, [and] respond appropriately to changes in routine work setting." (Tr. 29–30, 429.)

### 3.    ALJ's Conclusion as to Issues One and Three

In his September 16, 2010 decision, the ALJ found that Nelson's "depression" was a severe impairment. (Tr. 20.) The ALJ then undertook a detailed review of Nelson's testimony regarding her symptoms and of all the medical evidence and ultimately included one limitation in her RFC relating to her mental impairment: jobs with a reasoning development level of one or two. (Tr. 27.) The ALJ explained that he gave "great weight" to Dr. Reddy's opinion and "no weight" to Dr. Lilly's opinion. (Tr. 30, 31.) The ALJ's explanation for giving Dr. Lilly's opinion no weight was that, when Dr. Lilly examined Nelson and assessed her low GAF score, Nelson was not participating in any psychotherapy or taking any psychotropic medications. Furthermore, despite Nelson's low GAF score, she did not begin services at MHMR until three years later. (Tr. 31.) When Nelson finally did attend treatment at MHMR, "she reported spending significant amounts of time involved in the care of other family members, including a

nephew."[10]   (Tr. 31.)   Furthermore, her psychiatric examinations at MHMR revealed no significant abnormalities and very low symptoms,[11] and she reported that she found counseling helpful. (Tr. 31.)

###### a.    Issue One: "Anxiety/Depression"

Nelson complains in her first issue that the ALJ erred by failing to find her "anxiety/depression" to be a severe impairment.  Although the ALJ included "depression" in his listing of Nelson's severe impairments, he did not specifically identify "anxiety" in this list.  But while Nelson's primary care physicians prescribed her Xanax for anxiety in 2004–05 and an internal medicine consultative examiner noted generalized anxiety, the medical records do not include any diagnosis of an anxiety disorder by a mental health specialist.   Rather, the specialists' opinions indicate that Nelson's mental impairment was a mood disorder or depressive disorder.  Specifically, 1) Dr. Lilly diagnosed Nelson with mood disorder due to multiple health problems with depressive features; 2) Dr. Reddy opined that Nelson suffered from a mood disorder due to a medical condition; and 3) the MHMR psychiatrist diagnosed Nelson with major depressive disorder, recurrent, severe without psychotic features.

These specialists' records include observations of anxiety, but as a symptom of Nelson's diagnosed mood disorder/depressive disorder, not as a separate mental disorder.  The ALJ was entitled to give more weight to the opinions of the psychologist and psychiatrists about Nelson's mental impairment than to the opinions of primary care and internal medicine physicians, who are not specialists in mental health issues.  *See* 20 C.F.R. §§ 404.1527(c)(5), 420.927(c)(5).

---

[10] The ALJ also stated that Nelson reported to MHMR that "the main reason she was not in the labor force was that she could not find/keep a job."  (Tr. 31.)  However, the same medical record also reflects that Nelson reported to MHMR that she had been "unemployed since 2001 *due to health*."  (Tr. 661) (emphasis added).  Therefore, the Court questions whether, in context, Nelson's being unable to "find/keep a job" necessarily contradicts her claim of disability.

[11] The ALJ states that the MHMR psychiatrist found Nelson to have only one negative symptom (depression), but the record shows that the psychiatrist actually recorded two negative symptoms (depression and anxiety), both rating a score of one on a severity scale of one to ten.  (Tr. 682, 685.)

Thus, the ALJ's decision not to include anxiety or "anxiety/depression" in the list of Nelson's severe impairments is the result of credible evidentiary choices and is supported by substantial evidence in the record. *See Boyd*, 239 F.3d at 704; *Leggett*, 67 F.3d at 564. Remand on Nelson's first issue is not required.

### b.    Issue Three: Nonexamining Physician

Nelson further complains in her third issue that the ALJ improperly relied on the opinion of a nonexamining physician, Dr. Reddy. While the regulations do not require an ALJ to give controlling weight to opinions of nontreating sources, they do require the ALJ to evaluate every medical opinion in the record. 20 C.F.R. §§ 404.1527(c), 416.927(c).[12] An ALJ may give less weight to a medical opinion that is not well supported by relevant evidence—particularly medical signs and laboratory findings—or is not consistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c)(3)–(4), 416.927(c)(3)–(4).

Nelson challenges Dr. Reddy's opinion that she could "attend and concentrate for extended periods, interact adequately with co-workers and supervisors, [and] respond appropriately to changes in routine work setting" because it contradicts Dr. Lilly's opinion that she could not "return to work in a competitive environment where she will be required to maintain attention, concentration, persistence or pace or complete a normal workday." However, the ALJ provided reasons for his decision to give Dr. Lilly's opinion no weight, including 1) the three-year gap between Dr. Lilly's opinion and Nelson's finally obtaining

---

[12] If controlling weight is not given to a treating source's opinion, the ALJ must consider six factors in deciding the weight to be given to each medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). These factors are 1) whether the source examined the claimant; 2) whether the source treated the claimant; 3) the medical signs and laboratory findings that support the opinion; 4) the consistency of the opinion with the record as a whole; 5) whether the opinion is made by a specialist or nonspecialist; and 6) any other factor that tends to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c).

treatment for her depression;[13] 2) Nelson's spending "significant amounts of time" caring for other family members, including her nephew; and 3) MHMR treatment records that "did not document any significant abnormalities." (Tr. 31.)

Nelson also contends that Dr. Lilly's opinion is more consistent with the MHMR records because the records show that Nelson was diagnosed with severe depression, and her low GAF scores show that she was incapable of working. However, a GAF score is not determinative of a claimant's ability to work. *See Fuller v. Astrue*, No. 4:09-CV-197-A, 2010 WL 5566819, at *8 (N.D. Tex. Oct. 13, 2010), *adopted in* 2011 WL 94549 (N.D. Tex. Jan. 11, 2011). Federal courts have specifically declined to find a link between a claimant's GAF score and her ability or inability to work. *See* 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000) (declining to endorse the GAF scale for use in Social Security and SSI disability programs and stating that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings"); *see also, e.g., Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005); *Andrade v. Astrue*, No. 4:11-CV-318-Y, 2012 WL 1106864, at *8 (N.D. Tex. Feb. 13, 2012), *adopted in* 2012 WL 1109476 (N.D. Tex. Apr. 2, 2012). Other than the GAF scores, Nelson's MHMR records show that, upon receiving treatment in late 2009 and early 2010, Nelson reported "doing a lot better," and her only symptoms—depression and anxiety—rated as extremely mild. And even when Nelson's symptoms worsened in the latter half of 2010 and early 2011, her depression was still rated as "mild" in three of the four visits contained in the MHMR records, even with Nelson's lack of medication compliance.

---

[13] The Court recognizes that Nelson attempted to obtain services from MHMR about a year after the date of Dr. Lilly's opinion but did not meet MHMR's eligibility criteria at that time. Nevertheless, MHMR referred Nelson to other mental health treatment providers, but Nelson does not direct the court to any evidence that she sought treatment from these other sources.

In short, the ALJ thoroughly reviewed the evidence relating to Nelson's mental impairment and, as he was required to do, explained his reasoning underlying his decision to give Dr. Reddy's opinion great weight and Dr. Lilly's opinion no weight. While Nelson undoubtedly disagrees with the ALJ's rationale, it constitutes sufficient evidence to support the ALJ's conclusion, and this Court cannot reweigh the evidence and substitute its own judgment for the ALJ's opinion. *Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1383. Accordingly, remand on the third issue is not required.

**B.**     **Nelson's Physical Impairments**

      **1.**     **"Treating Physician's Rule"**

In her second issue, Nelson argues that the ALJ erred by rejecting the opinion of her treating physician, Sean A. Dalley, M.D. ("Dr. Dalley"). The regulations require an ALJ to give controlling weight to a treating source's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ does not give the treating source's opinion controlling weight, he must apply the factors listed in sections 404.1527(c) and 416.927(c) to determine what weight to give to the opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ stated in his decision that he had considered several opinions from Dr. Dalley. First, on March 28, 2006, Dr. Dalley completed a "Medical Release/Physician's Statement" opining that Nelson could work fifteen hours per week with the restrictions that 1) sitting was limited to one hour per day, 2) standing was limited to two hours per day, and 3) lifting was limited to ten pounds for up to two hours per day. (Tr. 492.) On July 22, 2006, Dr. Dalley stated that Nelson had been "briefly" under his care only for "the last few months" but that, based upon his review of Nelson's prior medical records, Nelson was "unable to perform work of any kind at

the present time due to the symptoms which are uncontrolled. . . . [A]t present, she should be considered disabled." (Tr. 476.)   On November 30, 2006, Dr. Dalley completed a "Multiple Impairment Questionnaire" in which he documented Nelson's diagnoses of migraines, seizure disorder, and arthritis as of July 2006, the last time he had seen Nelson, and provided his opinion regarding Nelson's work-related abilities.[14]   (Tr. 461–68.)   On February 5, 2008, Dr. Dalley provided another "Medical Release/Physician's Statement" stating that Nelson could stand for two hours per day but was limited to less than one hour per day of sitting, walking, climbing, kneeling/squatting, bending/stooping, pushing/pulling, keyboarding, and lifting/carrying.   (Tr. 611.)   Finally, on February 25, 2008, Dr. Dalley completed another "Multiple Impairment Questionnaire." (Tr. 616–623.) The ALJ observed that the answers on this questionnaire were "essentially the same" as Dr. Dalley's questionnaire responses in November 2006. (Tr. 25.)

On May 12, 2006, Nelson underwent a consultative internal medical examination performed by Oscar Becerra, M.D. ("Dr. Becerra").   (Tr. 404–12.)   Dr. Becerra observed 1) crepitus of the right shoulder,[15] 2) cubitus valgus of the left elbow, [16] 3) bilateral swollen wrists, and 4) decreased grip strength bilaterally. (Tr. 408–09.) Dr. Becerra diagnosed Nelson with 1) polyarthritis, possible rheumatoid arthritis, worsening; 2) seizure disorder, uncontrolled; and 3) generalized anxiety, uncontrolled.   (Tr. 409.)   Dr. Becerra opined that Nelson's seizures "limit[ed] her capacity to be employed" and that her arthritis "appear[ed] significant [enough] to interfere with work that demands significant mobility." (Tr. 409.) The ALJ noted Dr. Becerra's observation that "[s]quatting was performed slowly, and she had cubitus valgus of her left elbow

---

[14] Because the ALJ's decision contains a thorough report of Dr. Dalley's responses to this lengthy questionnaire, the Court will not reproduce the responses here. (Tr. 24.)

[15] Crepitus is "the grating of a joint, often in association with osteoarthritis." *Crepitus, in Stedman's Medical Dictionary* (27th ed. 2000), *available at* STEDMANS 94470 (Westlaw).

[16] Cubitus valgus is a "deviation of the extended forearm to the outer (radial) side of the axis of the limb." *Cubitus valgus, in Stedman's Medical Dictionary* (27th ed. 2000), *available at* STEDMANS 96850 (Westlaw).

and bilateral swollen wrists." (Tr. 30, 408.)  But the ALJ also noted that, even though Nelson

had complained frequently of pain and had walked slowly during the exam, she nevertheless had

been able to sit, stand, and move about during the exam. (Tr. 30, 407.)  She had no muscle pain,

vertebral pain, or trigger point tenderness, and her straight leg raise testing was normal. (Tr. 30,

408.)

On August 1, 2006, at Dr. Dalley's referral, Nelson was examined by neurologist Roger

S. Blair, M.D. ("Dr. Blair") for evaluation of her headaches. (Tr. 452–57.)  Dr. Blair observed

that Nelson's gait was regular and that she had normal strength and sensation. (Tr. 455.)  Nelson

had normal range of motion except for loss of flexion in her bilateral shoulders. (Tr. 455.)  She

had moderate trigger points in her right neck muscles and prominent trigger points in her left

neck muscles. (Tr. 455.)  An MRI of the brain showed no change since the last MRI that had

been performed in 2001. (Tr. 450.)  Dr. Blair diagnosed Nelson's headaches, as well as her

shoulder and arm pain, as myofascial in origin, and he recommended that Nelson perform

stretching exercises to help relieve and prevent pain. (Tr. 456.)

The ALJ noted the limited frequency of exams in Nelson's treating relationship with Dr.

Dalley, observing that she "was seen only a handful of times by Dr. Dalley over the course of

two years." (Tr. 30.)  *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) (stating that "the

longer a treating source has treated you and the more times you have been seen by a treating

source, the more weight [the Commissioner] will give to the source's medical opinion").  The

ALJ also observed that Dr. Dalley's exam records do not document "any significant clinical

findings" and that Dr. Dalley's opinions appeared to be based solely on Nelson's self-reports.

(Tr. 30.)  *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (stating that "[t]he more a medical

source presents relevant evidence to support an opinion, particularly medical signs and

laboratory findings, the more weight [the Commissioner] will give that opinion").  The ALJ

concluded that, because the records of Dr. Becerra and Dr. Blair "clearly portray the image of an essentially physically healthy woman," Dr. Dalley's opinions regarding Nelson's limitations were not supported by the exam findings of Dr. Becerra and Dr. Blair. (Tr. 30.) Therefore, the ALJ stated that he had given Dr. Dalley's opinions little weight. (Tr. 30.)

Nelson points to records of several exams performed by Dr. Dalley as supporting evidence for Dr. Dalley's opinions. For example, 1) an MRI performed in 2001 showed disk bulges at C3-4 and C6-7; 2) Dr. Dalley noted muscle tightness and decreased range of motion at Nelson's cervical spine on March 24, 2006; and 3) Dr. Dalley recorded numbness and soreness (with no location specified) at an exam on February 4, 2008. (Tr. 327, 474, 614.) While these records may constitute objective evidence of some impairment or pain, Nelson does not explain how they necessarily support the more extreme degree of functional limitations urged by Dr. Dalley, as opposed to the lesser functional limitations found by the ALJ. Moreover, the remaining information in Dr. Dalley's exam records upon which Nelson relies consists of either Nelson's own subjective complaints or Dr. Dalley's diagnoses of various impairments, which do not on their own establish the extent of Nelson's alleged limitations. *See Morris v. Astrue*, No. 4:11-CV-631-Y, 2012 WL 4468185, at *8 (N.D. Tex. Sept. 4. 2012) (explaining that a mere diagnosis of an impairment is not sufficient to establish its severity), *adopted in* 2012 WL 4466144 (N.D. Tex. Sept. 27, 2012).

Nelson also argues that Dr. Becerra's consultative exam findings support Dr. Dalley's opinions. Dr. Becerra opined that Nelson's arthritis would interfere with work that demands significant mobility and that Nelson's seizures limited her capacity to be employed. (Tr. 409.) Again, however, Nelson does not explain how Dr. Becerra's opinion necessarily supports the more extreme degree of functional limitations urged by Dr. Dalley, as opposed to the lesser functional limitations found by the ALJ. The ALJ agreed that Nelson suffered from generalized

arthritis, as documented by Dr. Dalley, Dr. Becerra, and Dr. Blair, but that the medical evidence did not show that she was limited to the degree that all work activity was precluded.  (Tr. 31.) Additionally, the ALJ observed that Nelson's seizures and headaches appeared to be "mostly controlled" due to "the lack of documentation of observed events, a normal EEG, and an unchanged MRI"; even so, the ALJ incorporated seizure precautions into Nelson's RFC.  (Tr. 31.)

To sum up, the ALJ thoroughly reviewed the evidence relating to Nelson's physical impairments and resulting limitations.  As he was required to do, the ALJ explained the reasoning underlying his decision not to give Dr. Dalley's opinion controlling weight, including 1) the brief treatment relationship between Dr. Dalley and Nelson; 2) the lack of clinical and laboratory diagnostic techniques underlying Dr. Dalley's opinion; and 3) the inconsistencies between Dr. Dalley's opinion and the findings of other examining doctors, as well as the record as a whole.  Again, Nelson may disagree with the ALJ's rationale, but it constitutes sufficient evidence to support the ALJ's conclusion, and this Court cannot reweigh the evidence and substitute its own judgment for the ALJ's opinion.  *Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1383.  Accordingly, remand on the second issue is not required.

### 2.    Upper-Extremity Manipulative Abilities

In her fourth issue, Nelson argues that the ALJ erred by failing to undertake a function-by-function assessment of Nelson's RFC, particularly with regard to her upper-extremity manipulative abilities.  The state agency medical consultant's June 6, 2006 RFC assessment included manipulative limitations on handling and fingering.  (Tr. 434.)  The state agency medical consultant stated that he had based these conclusions on Dr. Becerra's consultative exam findings of osteoarthritic hands with reduced grip bilaterally.  (Tr. 434, 436.)  The ALJ acknowledged these conclusions, but he stated that he did not agree with these upper-extremity

limitations because they were not supported by any diagnostic studies or objective evidence. (Tr. 29.) The ALJ found that Nelson's presentation at her consultative exam with Dr. Becerra "appeared staged, as the clinical findings and her subsequent presentations have revealed an essentially healthy individual." (Tr. 29.) Thus, the ALJ did not include any manipulative limitations in his RFC assessment.

As supporting evidence for her claimed manipulative limitations, Nelson points to 1) the 2001 MRI showing disk bulges in her cervical spine; 2) Dr. Becerra's diagnoses and exam findings, including swollen wrists, decreased grips, cubitus valgus of the left elbow, and crepitus in her right shoulder; and 3) Dr. Blair's exam findings of trigger points and diagnosis of frozen shoulders. However, the ALJ pointed out that there were no clinical findings (such as carpal tunnel syndrome, EMG or nerve conduction studies) that would indicate the existence of upper-extremity limitations. (Tr. 31.) Further, Dr. Blair's exam findings report normal reflexes in the upper and lower extremities (including the arms and fingers), intact sensation in upper and lower extremities, and "no drift, atrophy, fasciculations, or weakness in any of the muscles of the upper or lower extremities." (Tr. 455.)

Accordingly, the ALJ properly reviewed and considered the evidence relating to Nelson's manipulative functions in his RFC assessment and explained his reasoning underlying his decision to reject the state agency medical consultant's opinion regarding the upper-extremity limitations. Specifically, the ALJ's decision makes clear that the ALJ gave no weight to this opinion because it was not supported by relevant evidence—particularly medical signs and laboratory findings—and was inconsistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c)(3)–(4), 416.927(c)(3)–(4). The ALJ's rationale is supported by credible evidentiary choices among the medical evidence in the record and demonstrates the existence of substantial evidence supporting the ALJ's decision. *See Boyd*, 239 F.3d at 704. Because this Court may

neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's,

remand on this issue is not required. *See Harris*, 209 F.3d at 417; *Hollis*, 837 F.2d at 1383.

### C.     Credibility

Finally, in her fifth issue, Nelson challenges the ALJ's credibility finding.  When medical

evidence shows that a claimant has a medically determinable impairment that could reasonably

be expected to produce the claimant's symptoms, including pain, the ALJ then must evaluate the

"intensity and persistence" of the claimant's symptoms to determine how the symptoms limit the

claimant's capacity for work.  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); *see also* SSR 96-7p,

61 Fed. Reg. 34483, 34484 (July 2, 1996).  The ALJ must consider all of the available evidence,

including 1) the claimant's history; 2) signs and laboratory findings; and 3) statements from the

claimant, treating or nontreating sources, or other persons about how the symptoms affect the

claimant.  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  The ALJ may consider various factors

relevant to a claimant's credibility, including 1) the claimant's daily activities; 2) the location,

duration, frequency, and intensity of the pain or other symptoms; 3) precipitating and

aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication that the

claimant takes or has taken to alleviate pain or other symptoms; 5) treatment, other than

medication, that the claimant receives or has received for relief of pain or other symptoms; 6)

any measures used to relieve pain or other symptoms; and 7) any other factors concerning the

claimant's functional limitations and restrictions due to pain or other symptoms.  *Id.* §§

404.1529(c)(3), 416.929(c)(3).  "The reasons for the credibility finding must be grounded in the

evidence and articulated in the determination or decision."  SSR 96-7p, 61 Fed. Reg. at 34486.

The ALJ found that Nelson's "medically determinable impairments could reasonably be

expected to cause some of her alleged symptoms; however, the claimant's statements concerning

the intensity, persistence, and limiting effects of these symptoms are not credible to the extent

they are inconsistent with [the RFC finding]." (Tr. 29.) The ALJ went on to explain as follows:

> Ms. Nelson has a poor work history and has admitted the main reason she is
> unemployed is that she cannot find a job. The record documents her reporting on
> several occasions that she was responsible for caring for several family members
> as well as having assumed the role of parental figure for a nephew and cousin.
> Her presentation at the two consultative examinations appears staged, as the
> clinical findings and her subsequent presentations have revealed an essentially
> healthy individual. I did not find the claimant's allegations that she cannot use
> her hands and arms for overhead reaching or other manipulative tasks credible
> because the severity she described is not objectively documented. There is no
> indication she requires additional knee surgery. She sought services with MHMR
> only after her case was remanded by the Appeals Council and, even then,
> expressed reluctance at taking medication. (Tr. 29.)

Nelson argues that the ALJ failed to properly consider and document his determination of

her credibility. The Court disagrees because the ALJ's explanation above demonstrates that he

considered all the evidence, including Nelson's history, medical records, medical opinions, and

Nelson's own testimony, before concluding that Nelson's subjective complaints were not

credible to the extent that she alleged. The Court recognizes that, contrary to the ALJ's

statement, Nelson actually did seek treatment with MHMR in 2007 before her case was

remanded, although she did not qualify for treatment at that time. But even though MHMR

referred Nelson to other mental health treatment providers, there is no evidence that Nelson

made any further efforts to obtain treatment until after the Appeals Council's remand in 2009.

Accordingly, the basis of the ALJ's reasoning—that Nelson did not make meaningful efforts to

obtain mental health services until years after the alleged onset date of her mental impairment—

is unaffected by any oversight on the part of the ALJ in failing to recognize Nelson's

unsuccessful MHMR application in 2007.

The Court also recognizes that another reason given by the ALJ for discounting Nelson's

credibility was that she admitted that she was unemployed because she could not find a job.

However, Nelson also contemporaneously reported to MHMR that she was unemployed "due to

health." (Tr. 661.)  Again, the Court questions whether, in context, Nelson's statement that she was unable to find a job necessarily contradicts her claim of disability.  Even assuming that it does not, the Court finds that the remainder of the ALJ's rationale demonstrates that substantial evidence supports the ALJ's finding that Nelson's subjective complaints were not entirely credible.  *See Harris*, 209 F.3d at 417; *Hollis*, 837 F.2d at 1383.  Therefore, remand on this issue is not required.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions, and recommendation within fourteen (14) days after the party has been served with a copy of this document.  The United States District Judge need only make a de novo determination of those portions of the United States Magistrate Judge's proposed findings, conclusions, and recommendation to which specific objection is timely made.  *See* 28 U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge.  *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until January 30, 2013, to serve and file written objections to the United States Magistrate Judge's proposed

findings, conclusions, and recommendation.  It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED January 16, 2013.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE